**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

**HUNTSMAN INTERNATIONAL LLC AND
THE HUNTSMAN INTERNATIONAL LLC
EMPLOYEE WELFARE BENEFITS PLAN,**

**Plaintiffs,**

**v.**

**AETNA LIFE INSURANCE COMPANY,**

**Defendant.**

**Civil Action No. _____**

**COMPLAINT**

4891-1922-9117

Plaintiffs Huntsman International LLC and the Huntsman International LLC Employee Welfare Benefits Plan (together, with Huntsman International LLC, "Huntsman" or "Plaintiffs") through their undersigned counsel, submit this complaint against Aetna Life Insurance Company ("Aetna" or "Defendant"), and allege as follows:

## PRELIMINARY STATEMENT

1.      Huntsman is an American multinational manufacturer and marketer of chemical products for consumers and industrial customers.  Huntsman operates more than seventy manufacturing, research and development, and operations facilities in more than thirty countries. Huntsman employs more than 6,000 associates and had revenues in 2023 of more than $6 billion. In 2012, Huntsman hired Aetna to administer the Huntsman International LLC Employee Welfare Benefits Plan (the "Plan").  As of December 31, 2023, the Plan provided medical coverage for nearly 1,600 Huntsman employees and retirees, along with their family members ("Plan Participants").  The Plan is organized and operated under the Employee Retirement Income Security Act of 1974 ("ERISA").

2.      Aetna leveraged its role as the third party administrator or "TPA" to enrich itself to Huntsman's detriment.  Aetna breached its fiduciary duties and engaged in prohibited transactions.

3.      Aetna serves as the intermediary between Huntsman and the health care providers who treat and care for Plan Participants.  In exchange for a monthly fee, Aetna provides access to its network of providers and adjudicates claims for payment submitted by those providers.  In other words, Aetna decides which claims should be paid and how much to pay.  In practice, however, Aetna routinely breaches its ERISA responsibilities, including by engaging in practices designed to conceal Aetna's misconduct.

1

4.      Aetna engaged, and continues to engage, in concealment to hide its myriad breaches of duties to the Plan.  Aetna prevents the Plan from seeing what it is doing by contractually limiting audit rights, prohibiting providers from speaking to the Plan about what Aetna paid them, and preventing the Plan from obtaining or accessing data, which is required by federal regulation, about the actual financial transactions between Aetna and providers.

5.      Since 2012, Aetna has taken millions from Huntsman to pay providers for medical services provided to Plan Participants.  That includes (a) millions of dollars in provider claims that never should have been paid; (b) millions of dollars in undisclosed fees; and (c) claims-processing related misconduct to Huntsman's detriment.

6.      Aetna is a fiduciary under ERISA.  Aetna owes ERISA-imposed fiduciary duties to Huntsman.  Its conduct breached those duties.

7.      Huntsman brings this action seeking equitable relief[1] for harm caused by Aetna's wrongful conduct and to prevent Aetna's unjust enrichment.

**PARTIES**

8.      The Plan is a health and welfare benefit Plan organized and operated under ERISA.

9.      Huntsman International LLC is a Delaware corporation located at 10003 Woodloch Forest Drive, The Woodlands, Texas.

10.      Defendant Aetna Life Insurance Company is a Connecticut corporation located at 151 Farmington Road, Hartford, Connecticut.

---

[1]      The Agreement, as defined in ¶ 18, contains an arbitration clause that explicitly excludes "[a]ny controversy or claim" seeking "any [ ] form of equitable relief," such as ERISA claims seeking equitable relief, from the scope of any arbitration. Agreement § 17. Analyzing an identical arbitration clause, this Court has already held that (1) the plain language of the clause permits the Court to interpret threshold issues of arbitrability, and (2) monetary claims arising under ERISA §§ 1132(a)(2) and (a)(3) are equitable in nature and therefore not subject to mandatory arbitration. *See Aramark Services, Inc. et al. v. Aetna Life Ins. Co.*, 23-cv-00446-JRG (E.D. Tex. Apr. 26, 2024) (Dkt. 43 at 5, 7).

2

## JURISDICTION AND VENUE

11.     Pursuant to 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331, this Court has jurisdiction over the claims asserted in this Complaint.

12.     The Court has personal jurisdiction over Aetna because, at all times relevant to the claims asserted herein, Aetna conducted business in the State of Texas within the meaning of the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.  Aetna's contacts with the State of Texas include, but are not limited to:

a.     Since 1909, Aetna has been registered with the Texas Department of Insurance to operate in Texas (including in this District).  The Texas Department of Insurance licensed Aetna to offer health insurance products in the State (and accident and life insurance and variable annuities).  Aetna has license number 400.  Since receiving its license, Aetna has operated continuously in the State;

b.     As of 2022, Aetna was the sixth largest insurer in the State with a market share of 4.73% and reported premium intake of $2,728,396,377.[2]  Neither the market share nor premium revenue include the market share or premiums of other companies that may be affiliated with Aetna;

c.     Aetna has multiple offices in the State and within this District;

d.     Aetna has contractual relationships with hundreds, if not thousands, of doctors, hospitals, and other healthcare providers that care for and treat patients in Texas and in this District, ranging in size from large hospital systems to single doctor practices (generally, those who render health care will be referred to as "providers");

e.     Aetna provides medical and dental insurance coverage to thousands of families and individuals who reside in Texas in the District;

f.     Aetna has contractual relationships with hundreds of employers and plan sponsors that are based in, operating in, have employees working in, or have employees residing in Texas and in this District; and

g.     Aetna provides and has provided medical and dental coverage to Huntsman employees and their families in Texas.

---

[2]     *See Top 40 List of Insurers in Texas*, TEX. DEP'T INS. (Apr. 3, 2024), https://www.tdi.texas.gov/company/top40.html.

13.     By agreeing to contract, adjudicate, and transmit payments for medical treatment and dental care of Huntsman employees, retirees, and beneficiaries residing in Texas, and for medical and dental care rendered in Texas, Aetna purposefully availed itself of the privilege of conducting business within Texas.

14.     Aetna previously filed complaints and prosecuted claims in this District.  Aetna has previously been sued in this District and did not object to jurisdiction or venue.

15.     For the reasons stated above, venue is also proper in this District pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b)(2).

## BACKGROUND

16.     Huntsman lacks the expertise to evaluate claims for payment submitted by providers that cared for Plan Participants—a process called claims adjudication.  Huntsman contracted that responsibility to Aetna when it became one of the Plan's TPAs in 2012, pursuant to a competitive request for proposal process.  Huntsman was assisted in that competitive request for proposal process by best-in-class benefits consultants and related professionals.  Huntsman selected Aetna as one of the Plan's TPAs and fiduciaries because Aetna represented its expertise in evaluating payment claims submitted by providers for adherence to the Plan's coverage and reimbursement policies and industry-standard coding guidelines dictated by the Centers for Medicare and Medicaid Services ("CMS") and the American Medical Association ("AMA"), among others.

17.     As a TPA, Aetna does not provide traditional medical insurance to Huntsman employees or retirees.  Aetna did not pay medical expenses for participants of the Plan in exchange for premiums.  Rather, Huntsman retained the financial risk of increased medical expenses among its beneficiaries and participants by funding the medical expenses incurred by the Plan's beneficiaries using funds allocated from Huntsman for that purpose.  In other words, Huntsman

self-funded its employees' medical expenses (with contributions from some employees in certain circumstances).

18.    The January 1, 2012 Master Services Agreement No. 100589 (the "Agreement") identifies Aetna as a fiduciary:

> Aetna agrees that it will discharge its obligations under this Services Agreement with that level of reasonable care which a similarly situated [s]ervices provider under ERISA would exercise under similar circumstances. . . .  In connection with fiduciary powers and duties hereunder, if delegated by Customer to Aetna as noted in the Claim Fiduciary section of the applicable SAS, *Aetna shall observe the standard of care and diligence required of a fiduciary under ERISA Section 404(a)(l)(B) and shall discharge its fiduciary duties with respect to the Plan solely in the interest of the Plan and Plan Participants as required by ERISA.*"

Agreement § 4 (emphasis added).

> Customer and Aetna agree that with respect to Section 503 of the Employee Retirement Income Security Act of 1974, as amended, Aetna will be the "appropriate named fiduciary" of the Plan for the first two levels of appeal for purpose of reviewing denied claims under the Plan.  Customer understands that the performance of such fiduciary duties under ERISA necessarily involves the exercise of discretion on Aetna's part in the determination and evaluation of facts and evidence presented in support of any claim or appeal.  Therefore, and to the extent not already implied as a matter of law, *Customer hereby delegates to Aetna discretionary authority to determine entitlement to benefits under the applicable Plan Documents for each claim received, including discretionary authority to determine and evaluate facts and evidence, and discretionary authority to construe the terms of the Plan.*

Agreement, Statement of Available Services § II (emphasis added).

19.    Aetna's decision-making authority under the Agreement went far beyond mere application and compliance with its own guidelines.  Because Aetna exercised discretionary authority and control over the management of the Plan and the disposition of the Plan's assets, in addition to being a named ERISA fiduciary, Aetna was also a functional fiduciary.

20.    As a fiduciary, Aetna agreed to provide "Claim Services" for the Plan.  Specifically, and by way of example, Aetna agreed to "process and pay claims for Plan benefits . . . using

Aetna's normal claim determination, payment, and audit procedures and applicable cost control standards in a manner consistent with the terms of the Plan and the Services Agreement." Agreement at 17.

21.     As a fiduciary, Aetna agreed to be responsible for processing and reviewing claims for health benefits by Plan Participants, including: (i) the eligibility of each claimant under the terms of the Plan, and (ii) the eligibility of the claim for health benefits under the terms of the Plan.

22.     As a fiduciary, Aetna agreed to be responsible for the approval and payment of only those claims that are legitimate, *i.e.*, not those that are fraudulent or otherwise improper and otherwise failed to satisfy the requirements of the Plan.  All other claims for payment were required to be denied.  The Agreement provides:

> Aetna shall provide Plan Participants with access to Aetna's network hospitals, physicians and other health care providers ("Network Providers") who have agreed to provide services at agreed upon rates and who are participating in the applicable Aetna network covering the Plan Participants. . . . [W]hen a claim is submitted for services incurred after the Effective Date, covered by the Plan, and performed by a Network Provider, Aetna will issue a payment on behalf of Customer for those services in an amount determined in accordance with the Aetna contract: with the Network Provider and the Plan benefits.  In addition to standard fee-for-services rates, these contracted rates with network providers may also be based on case rates, per diems and in some circumstances, include risk-adjustment mechanisms, quality incentives, pay-for-performance and other incentive and adjustment mechanisms.

Agreement at 33.

23.     Aetna likewise exercised discretion with respect to recovery of overpayments on medical claims.  As a fiduciary, Aetna had an affirmative obligation to seek recovery of any fraudulent, illegitimate, or erroneous payments Aetna made on the Plan's behalf:

> Aetna shall reprocess any identified errors in Plan benefit payments (other than errors Aetna reasonably determines to be *de minimis*) and seek to recover any resulting overpayment by attempting to contact the party receiving the overpayment twice by letter, phone, or email.  The Customer may direct Aetna not to seek recovery of overpayments from Plan Participants, in which event Aetna will have no further responsibility with respect to those overpayments.  The Customer shall reasonably cooperate with Aetna in recovering all overpayments of Plan

6

benefits. . . . Customer may not seek collection, or use a third party to seek collection, of benefit payments or overpayments from parties other than contracted providers described above, until Aetna has had a reasonable opportunity to recover the overpayments. Aetna must confirm all overpayments before collection by a third party may commence.  Customer may be charged for additional Aetna expenses incurred in overpayment confirmation.

Agreement at 9-10.

24.    As a fiduciary, Aetna also agreed to be responsible for providing subrogation and reimbursement services.  Under the Agreement, Aetna was obligated to pursue reimbursement of monies legally owed to the Plan:

Aetna has the exclusive discretion: (a) to decide whether to pursue potential recoveries on subrogation/reimbursement claims; (b) to determine the reasonable methods used to pursue recoveries on subrogated claims, subject to the proviso with respect to formal litigation above; and (c) to decide whether to accept any settlement offer relating to a subrogation/reimbursement claim if under $100,000.

Agreement at 34.  Aetna's discretion, however, was not unbounded.  Rather, it exercised its discretion as an ERISA fiduciary.

25.    Huntsman was entirely at Aetna's mercy when it came to the administration of its claims.  Once delegated to Aetna, Huntsman had no role in Aetna's decision to approve or deny claims.  Once delegated to Aetna, Huntsman also had no role in Aetna's decision to pay any particular amounts for approved claims.  Aetna was uniquely positioned to make discretionary decisions and exercise discretionary authority or control over plan management, including the right to change unilaterally the value of a fee or rate.  Aetna was further provided broad flexibility to determine its course of action in administering the Plan.  Huntsman relied on Aetna to process, review, and adjudicate claims for health benefits properly.  Aetna was authorized to pull from the Plan only the amount of money that was actually paid to providers.

26.    Aetna is an ERISA fiduciary when acting as a TPA.  *See Aramark Services, Inc. et al. v. Aetna Life Ins. Co.*, 23-cv-00446-JRG (E.D. Tex. April 26, 2024) (Dkt. No. 43 at 8)

7

(recognizing Aetna's status as a fiduciary when acting as a third-party claims administrator). Aetna served in that role for Huntsman. Aetna has also represented to judicial officers in other proceedings that, when acting as a TPA, Aetna is an ERISA fiduciary. *See, e.g.*, *Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030, 1033 (9th Cir. 2000) ("We agree with Aetna that the company qualifies as a fiduciary for purposes of the statute. 'When an insurance company administers claims for an employee welfare benefit plan and has authority to grant or deny the claims, the company is an ERISA "fiduciary" under 29 U.S.C. § 1002(21)(A)(iii).'"); *In re Omnicom Grp. Inc. ERISA Litig.*, No. 1:20-cv-4141, 2022 WL 18674830, at *15 (S.D.N.Y. Dec. 23, 2022) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271–72 n.8 (2d Cir. 1982)) ("Under ERISA, the duties owed by fiduciaries to plan participants and beneficiaries 'are those of trustees of an express trust—the highest known to the law.'").

27.    As a fiduciary of the Plan, Aetna had and continues to have a fiduciary duty to exercise "care, skill, prudence and diligence" to identify, deny, and prevent the payment of false, fraudulent, or improper provider-submitted claims or other claims that did not satisfy the eligibility and other requirements of the Plan.

28.    As a fiduciary, Aetna was and is prohibited from siphoning funds, effectively undisclosed fees, from the Plan under the false pretenses that it was paying claims while extracting undisclosed fees from the funds intended to pay medical services.

29.    Aetna breached its fiduciary duties by approving and paying false, fraudulent, and improper claims and withdrawing undisclosed fees from the Plan funds to pay those providers that cared for and treated Plan Participants.

30.    Notwithstanding its fiduciary obligations to "aggressively investigat[e] all types of fraud using the latest detection, investigation, and recovery techniques"—which it does for claims

8

under its own, fully-insured plans, as discussed below—Aetna approved and paid with the Plan's assets millions of dollars in claims that never should have been paid. *Aetna Special Investigations Unit*, AETNA 1, 2, https://www.aetnafeds.com/pdf/FraudBrochure.pdf. In most instances, the wrongfully paid claims were paid automatically, almost immediately, and with no human review.

**AETNA'S WRONGFUL CONDUCT**

**A.      Aetna Did Not Give Huntsman Its Own Medical Claims Data**

**1.      Administrative Simplification and Standard Transaction Basics**

31.     Federal regulations require that participants in the healthcare system, *e.g.*, providers, health plans, and insurers, exchange information regarding enrollment, eligibility, billing, claim status, adjustments, adjudication, and payment using specifically defined electronic data sets. Claim processing and payment are governed by the Health Insurance Portability and Accountability Act ("HIPAA") Administrative Simplification regulations. *See* 45 C.F.R. § 162.920(a). HIPAA requires "covered entities" to comply with all HIPAA transaction standards, operating rules, and code sets. *See* 45 C.F.R. §§ 160.103, 162.100. Aetna is a "covered entity" as that term is defined in Title 45 of the Code of Federal Regulations. These regulations require that the electronic data sets be used to send and receive the medical claims data in the X12 5010 standard. The Department of Health and Human Services has adopted the following EDI data set standards by regulation:

32.     *Eligibility and Benefits [270 and 271 transactions].* "The request transaction, known as the X12 5010 270 transaction for inquiries about eligibility and benefits, . . . can be sent from a health care provider to a health plan, or from one health plan to another[.] The response transaction, known as the X12 5010 271 transaction for health plan, responds to inquiries about eligibility/benefits[.]" *See Health Plan Eligibility and Benefits Transaction Basics*, CMS 1, 1, https://www.cms.gov/files/document/health-plan-eligibility-and-benefits-transaction-basics.pdf

("These standards apply to all HIPAA-covered entities—health plan (including Medicare and Medicaid), clearinghouses, and certain health care providers that conduct the adopted transactions electronically—not just those that work with Medicare or Medicaid.").

33.    *Payment / Invoicing / Coordination of Benefits [837 transaction].*  The 837 file is the electronic invoice that the medical provider submits to the insurance company for reimbursement.  The 837 contains information on insurance claims and includes data about the patient's treatments (such as the healthcare services delivered), the cost of medical care, and any modifications.

34.    HHS adopted the X12 837 standard for coordination of benefits ("COB").  "This standard applies to all HIPAA-covered entities—health plans, clearinghouses, and providers.  The 837 standard supports two options for conducting COB transactions: either between health plans and other payers, or from health care providers to health plans."  *See Coordination of Benefits Transactions Basics*, CMS  1,  1,  https://www.cms.gov/files/document/coordination-benefits-transactions.pdf.

35.    *Claim Status [276 and 277 transactions].*  "The 276 [is] the transaction for provider inquiries about claim status.  The 277 transaction [is] for health plan responses about claim status."  *See Claim Status Basics*, CMS  1,  1,  https://www.cms.gov/files/document/claim-status-transactions.pdf.

36.    *Claims Payment and Explanation [835 transaction].*  The 835 is the digital transaction that delivers claim payment details from the insurer to the provider.  The 835, like the 837, contains information such as what medical care is being reimbursed, and for what amount.  If the billed amount has been lowered or altered, the 835 also contains an explanation for any such adjustment.  The 835 also offers insurance details such as deductibles, co-payment amounts,

healthcare claim splitting, co-insurers, and bundling. One of the two standards for EFT transactions is "Accredited Standards Committee X12 Health Care Claim Payment/Remittance Advice (835), Version 005010X221 and its associated Errata Documents [ ], the standard for data content of the CCD+Addenda Record. The adopted standard for ERA [Electronic Remittance Advice] transactions is X12 835 V5010." *See EFT and ERA: Electronic Funds Transfer and Electronic Remittance Advice Transactions Basics*, CMS 1, 1, https://www.cms.gov/files/document/electronic-funds-transfer-and-electronic-remittance-advice-transactions.pdf.

37.    As a covered entity, Aetna must comply with HIPAA regulations.

38.    Consistent with the applicable regulations, Aetna employed the X12 5010 standard transaction data sets when it processed Huntsman's employees' medical claims.

39.    In addition to payers, *i.e.*, self-funded health plan and health insurance companies, and providers, "EDI clearinghouses" play a critical role in enabling the electronic transmission of medical claims. *See United States v UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 124 (D.D.C. 2022). "In 2021, 97 percent of medical claims were submitted electronically, and 95 percent of providers and 99 percent of insurers used EDI clearinghouses" to process those transactions. *Id.* at 125. A substantial amount of medical claims data flows through EDI clearinghouses—covering "the entire lifecycle of a claim—both pre- and post-adjudication." *Id.* "Pre-adjudicated claims data include details about the provider, the patient, the employer group, the location of care, the diagnosis, the services and procedures rendered, and the billed amounts"; "[p]ost-adjudicated claims data [ ] include[s] even more information, such as details about the provider-payer contract, the payer's claims edits, the medical policy and benefit design, the final paid amount, and adjudication decisions." *Id.*

40.    In practice, the medical claim submission and claim process works as follows: After a provider treats a patient, a treatment record is created and a standard billing form—CMS-1500 Health Insurance Claim Form, or the UB-04 (CMS-1450) institutional paper claim form—is prepared.  This is essentially a bill, invoice, or claim, prepared by the providers and submitted to Aetna.  In parallel, the information in these forms is usually translated into a specific, regulation-required ANSI X12 5010 format EDI data, the 837.

41.    Aetna publishes Companion Guides that provide instructions for electronic communications and supplemental information for creating transactions while ensuring compliance with ASC X12 instructions.

42.    Once the HCFA or 837 is transmitted to the insurance company, the insurance company must acknowledge receipt within two days.

43.    If Aetna accepts and processes the transaction (claim(s) and incurred charges), then it generates a document known as an "Electronic Remittance Advice" or an "835," which is a record of claims adjudication or adjustment and payment for the submitted claim.  An 835 is not a rejection of the claim.  The 835 is then required to be transmitted to the provider's office and maintained by Aetna in the standard or original format for auditability.

44.    If Aetna rejects a claim, then it does not generate an 835.  Rather, it generates an EDI data record referred to as a "999" and transmits that to the provider's office.  A rejected claim also triggers the creation of a CCD+ Addenda in the amount of $0.00.

45.    When a provider bills Aetna for services or treatment, they follow the industry standard service and treatment codes, including Current Procedural Terminology ("CPT") codes, Diagnostic-Related grouping ("DRG") codes, and International Classification of Diseases ("ICD") codes.

46.    Aetna did not provide Huntsman with the standard transaction data sets for the medical claims Aetna processes that are paid by Huntsman.  *See* 45 C.F.R. §§ 160.103, 162.100, 162.920(a).

**B.    Aetna Breached Its Fiduciary Duties**

47.    Aetna pulled millions of dollars from Huntsman to pay medical claims since being appointed TPA in 2012.

48.    Huntsman paid Aetna to police its claims.  Aetna did not do so.  Incomplete medical claims data for claims processed over a twenty-six-month period demonstrate that Aetna overpaid Huntsman's Plan Participants' claims by millions of dollars as a result of its failure to protect against abusive billing practices, payment errors, impossible pricing outliers, and non-covered services.  Aetna's conduct resulted in Huntsman paying millions of dollars more in medical claim fees than it should have since 2012.  These practices are discussed below.

**1.    Aetna Caused Huntsman to Pay Thousands of Improper, False, or Fraudulent Claims**

49.    Aetna appears to have approved thousands of claims that exhibit abusive billing practices.  This includes (a) claims with duplicate payments for the same services to the same provider for the same member; (b) submissions of claims that were untimely; (c) abusive drug testing; (d) COVID-19 testing abuse; and (e) errors in surgery claims.  This is based upon information and belief, and based on the limited data available to Huntsman.

50.    For example, Aetna approved no fewer than 230 claims containing clear surgical session errors.  During surgical sessions, an "assistant at surgery" actively assists the physician in charge of performing a surgical procedure.  Procedure modifiers in a medical claim are used to indicate the type of assistant.  Surgical assistance services provided by a physical assistant, nurse practitioner, or certified nurse specialist should be reimbursed substantially lower than the lead

13

surgeon.  It is Aetna's responsibility as TPA to identify instances where billing errors are apparent in a claim for reimbursement.  For example, during one surgical session, a "surgical technician" billed a procedure modifier identifying herself as a physician, resulting in her being billed out at $7,726—over 443% more than the actual orthopedic surgeon's reimbursement of $1,743.  Aetna nonetheless paid the full $7,726.

51.    In another example, medical records indicate two ultrasounds billed by a hospital, with only one interpretation (mod 26) billed by the radiologist.  Based on the single reading, an expected overpayment of $524 associated with this claim is owed to the Plan.

52.    In another example, a member had an orthopedic surgery.  All of the surgical codes billed by the surgeon were denied and the surgery was not covered.  However, eight units of anesthesia were covered and paid at a total cost of $1,626.  Moreover, the units for CPT 01992 (anesthesia) are typically expected to be less than four per visit and typically reimbursed under $500, when reimbursement is appropriate.  There is no explanation for why, if the surgery was not covered, the anesthesia for the surgery was reimbursed, let alone at double the normal rate.

53.    In another example involving spinal stenosis surgery, the surgeon opted to use "IONM" (interoperative neuromonitoring) during the surgery.  The IONM services were billed by a surgical technologist practicing in Waller, Texas.  The surgical tech's billing of the IONM services was initially denied.  Then, nearly two years later, it was resubmitted and paid.  The services billed by the surgical tech that were paid include both the technical and professional components of the IONM service (TC or 26 modifiers were not used indicating both components). The technologist can receive training to perform the test, however, does not have the licensure to interpret the professional components of the service.  Additionally, the professional component was already paid earlier to a neurologist.  The Plan nonetheless was charged and paid the

technologist $49,861 for the IONM service, more than 20 times the surgeon's fees for performing the spinal surgery. The reimbursement made on behalf of the Plan to the surgical tech was higher than the overnight hospital stay, which was $43,000. These claims appear to have been paid in error by Aetna when the provider whose claims were initially denied, resubmitted the claim with different modifiers months later. An associated overpayment of $49,861 is due back to the Plan.

54. Aetna's failure to police these abusive claims resulted in Huntsman being substantially overbilled. More troubling, Aetna used Huntsman funds to pay the vast majority of these claims automatically, often within days, without any review by Aetna. Upon information and belief, many of these claims are associated with particular providers with whom Aetna has explicit or informal agreements not to scrutinize their claims or to scrutinize only a limited number of the claims they submitted to Aetna.

### 2. Aetna Approved Payment of Dummy Codes to Pay Subcontractors

55. The Agreement permitted Aetna to use subcontractors or other contracted parties to provide the required services. The Agreement, however, did not permit Aetna to bill Huntsman for additional or incremental fees associated with the services provided by those subcontractors or other contracted parties. Aetna has a history of using "dummy" codes to conceal and pass subcontractor fees on to self-insured medical plans. *See e.g.*, *Peters v. Aetna, Inc.*, No. 1:15-cv-00109-MR, 2023 WL 3829407, at *3, *14 (W.D.N.C. June 5, 2023) (certifying a class where Aetna's subcontractor arrangement allowed for charging a fee greater than allowed by the plan contract and served to hide the excess fees from the plan and members by misidentifying these fees as part of a claim for services). Huntsman's investigation is not complete, but the incomplete medical claims data shows that Aetna paid with Huntsman funds claims with improbable, nonsense, undefined, or gibberish codes, like the ones used to compensate subcontractors, in violation of Aetna's fiduciary obligations.

**3.    Aetna Caused Huntsman to Pay Thousands of Excessive, Inflated, and Unjustifiable Claims**

56.    Between January 2020 and February 2023, Aetna also approved more than 2,500 claims with facially faulty pricing.  These include instances where the claim (a) was greater than the billed amount; (b) had inexplicably high prices for facility services; (c) was paid to in-network providers over five times Medicare standard pricing and otherwise inconsistent with the Plan; and (d) had extreme pricing variation relative to the amount the provider was regularly paid for the same services.

57.    By way of example, one member received the same service from the same provider group but was charged inconsistently for those services.  Specifically, a service that occurred in May of 2020 had an allowed price that was four times the rate of the same service billed to the same member two months later.  Then again, in November, the same service was billed at four times the rate, and then billed at the one time the rate in April 2021.  All of these claims appear to be automatically adjudicated.  As a result, an expected overpayment of $1,478 is owed to the Plan.

**4.    Aetna Caused Huntsman to Pay for Uncovered Claims**

58.    During the same sample period, Aetna approved no fewer than 200 claims for services that were not covered by the Plan.  The Plan does not cover every potential medical service or procedure.  Not only was Aetna aware of these exclusions, Aetna also assisted Huntsman in preparing the documents that identify treatments or procedures excluded from medical insurance coverage.  Such exclusions include cosmetic surgery, massage therapy, and routine vision services.

59.    By way of example, Adventist Health Texas Health Center for Diagnostics billed the Plan for what appears to have been a non-covered cosmetic surgery.  Rhinoplasty is known to be the most common procedure that is inappropriately billed to health insurance.  Surgeons charge for the repair of a "deviated septum" and then perform cosmetic rhinoplasty.  Aetna's policy states

16

that rhinoplasty is covered only (1) to correct a nasal deformity secondary to congenital cleft lip and/or palate; (2) for removal of a nasal dermoid; or (3) to correct chronic non-septal nasal airway obstruction from vestibular stenosis (collapsed internal valves) due to trauma, disease, or congenital defect. The medical context for the member does not align with the carrier's medical policy for coverage of this procedure. The surgeon's claim, totaling $7,528, was paid the same day it was received.

### 5.    Aetna Has Failed to Provide Subrogation Services

60.    Aetna also agreed to provide subrogation services. A claim is subject to "subrogation" when another party, besides Huntsman, is responsible to pay for the medical services provided. In the case of a car accident, for example, the responsible auto insurance company should pay, not Huntsman. Similarly, if the patient was treated for an "on-the-job" injury then the responsible worker's compensation fund should pay for the care, not Huntsman. Based on the limited information available to Huntsman today, Huntsman identified about $600,000 in claims where Aetna either did not adequately pursue subrogation or did not attempt it at all.

### 6.    Aetna Overpays Providers for Services in Excess of Contracted Rates

61.    Huntsman is responsible for disclosing pricing information for medical procedures pursuant to the Consolidated Appropriations Act of 2021 and Transparency in Coverage (TiC) Final Rules issued by the Department of Health and Human Services (HHS). Under the TiC, group health plans and health insurance issuers must disclose on a public website information regarding in-network provider rates for covered items and services, out-of-network allowed amounts and billed charges for covered items and services and negotiated rates, and historical net prices for covered prescription drugs in three separate machine-readable files. *See* 26 CFR § 54.9815-2715A3; 29 CFR § 2590.715-2715A3; 45 CFR § 147.212. Aetna must make these disclosures, on Huntsman's behalf, in electronic files that are in a machine-readable format dictated by CMS.

Prior to the enactment of the TiC, Huntsman did not have this information because it was not privy to the agreements that Aetna entered into with providers, much less the pricing terms for the services provided.

62. Aetna published the TiC information.

63. In connection with its fiduciary obligations to "exercise a level of reasonable care which a similarly situated services provider or plan administrator, respectively, would exercise under similar circumstances," Aetna represented, warranted, and agreed that for claims submitted to Huntsman, it would pay providers "who have agreed to provide services at *agreed upon rates* and who are participating in the applicable Aetna network covering the Plan Participants." Agreement at 33.

64. Huntsman compared the disclosed "agreed upon rates" for providers using a given CPT code and procedure against the paid claim amount for the same provider, CPT code, and procedure in a given year. Aetna regularly and repeatedly used Huntsman funds to pay providers *more* than the contracted rate in violation of Aetna's fiduciary duty to Huntsman.

65. This review is incomplete and ongoing. As of the time of this Complaint, Huntsman does not have sufficient information to quantify the full overcharges as a result of payments made above the "agreed upon rates." The limited data Huntsman does have from 2022 to 2023 indicates more than $2 million in overpayments.

**C.      Aetna Engaged in Post-Adjudication Adjustments Which Harmed Huntsman**

**1.      Aetna Engaged in Cross-Plan Offsetting**

66. Aetna engaged in cross-plan offsetting while serving as TPA for Huntsman to the detriment of Huntsman.

67. Cross-plan offsetting often benefitted Aetna, specifically its own fully-insured plans, at the expense of self-funded plans, like the Plan.

68.     To cross-plan offset, Aetna overpaid a provider using funds from the Plan.  Rather than collect the overpayment back from the provider, Aetna simply deducted the overpaid amount from the next payment to the provider.  Often, however, the "next" reduced payment came from a different plan such that the reduced amount of the "next" payment did not benefit the Plan.  Instead, that "next" payment came from either another self-funded plan or, more frequently, one of Aetna's fully-insured plans.  So, another self-funded plan or—in most cases—*Aetna itself* received the benefit of the reduced payment amount.

69.     For example, Doctor X treats a patient covered by the Plan.  Doctor X submits a claim for payment to Aetna in the amount of $1,000.  Aetna reviews the claim and pays Doctor X $1,000 for the service.  Aetna later decides that it should have paid Doctor X $600.  Aetna does not ask Doctor X for a refund.  Rather, Aetna waits until Doctor X treats another patient covered by an Aetna fully-insured plan—rather than the Plan.  Doctor X submits a claim for payment to Aetna for $1,000 for treating a second patient.  Aetna reviews the claim and decides Doctor X should be paid $600.  Rather than paying Doctor X $600 for treating the second patient, Aetna deducts the $400 overpayment on the first patient and pays Doctor X $200 for the second patient.  Aetna never refunded to the Plan or credited the Plan the $400 that Aetna initially overpaid for treating the first patient in this example.  Aetna used cross-plan offsetting to get Huntsman's self-funded Plan to illicitly subsidize its fully-insured book of business.

70.     Aetna benefitted from cross-plan offsetting to the detriment of the Plan, in breach of Aetna's fiduciary obligations to the Plan.  Aetna's practice of cross-plan offsetting has already been held to be unlawful and a violation of ERISA.  *See Lutz Surgical Partners PLLC et al. v. Aetna, Inc. et al.*, No. 3:15-cv-02595 (BRM)(TJB), 2021 WL 2549343, at *15–18 (D.N.J. June 21,

19

2021) (concluding "Aetna's cross-plan offsetting is prohibited by ERISA"), *vacated*, 2023 WL 2472403 (D.N.J. Feb. 8, 2023).

### 2. Aetna Reprocessed Claims to the Detriment of Huntsman

71. On information and belief, Aetna took funds from the Plan in an amount close to the provider-billed amount or the amount the provider was owed pursuant to an in-network agreement. Then, Aetna frequently reprocessed the claims. It did this for one reason: to adjudicate the claims at an amount lower than the amount taken from the Plan.

72. As a result of the reprocessing, Aetna used the lower, reprocessed amount to justify paying the provider less than the billed amount or the amount Aetna otherwise would be contractually required to pay the provider.

73. By reprocessing a claim, Aetna obtained negotiating leverage over the provider because this practice, whether justified or not, resulted in substantial delay of any payments to the provider.

74. It is not uncommon for Aetna to "reprocess" claims multiple times. As part of its reprocessing, Aetna frequently altered the claim number so that the claim could not be tracked accurately or traced as required by the applicable regulations. For example, Aetna's convention is to process (and reprocess) claims electronically. Such processed and reprocessed claims have an "E" prefix or leading character. If Aetna is not able to extract the agreement or concession from the provider to take a reduced rate for the claim, then Aetna replaces the "E" prefix or leading character of the claim identification number with a "P"—presumably for "paper"—and reprocesses the claim as a "paper" claim. This practice disconnects the original electronic claim from the "paper" claim and interferes with the tracing or audit trail associated with the original claim. Eventually, either Aetna does not pay the reprocessed claim or it pays the reprocessed claim at a significantly reduced rate.

75.     Aetna never refunded or credited to the Plan the difference between the amounts removed from the Plan's accounts and the amount ultimately paid to the provider pursuant to the reprocessed claims.  Aetna's retention of that difference violated its obligations as a fiduciary under ERISA.

**3.     Aetna Took More from the Plan Than It Paid Out-of-Network Providers**

76.     Aetna obtained undisclosed fees from the Plan under false pretenses.  When Aetna received a claim from an out-of-network provider, it frequently engaged a "repricing" company or companies to negotiate a lower amount that Aetna ultimately paid the providers.  On information and belief, Aetna used Zelis Healthcare Corp., MultiPlan Corp., and Global Claims Services.  Global Claims Services is owned by Aetna, has common ownership with Aetna, or is affiliated with Aetna more closely than through an arms-length contractual arrangement.

77.     The providers want to be paid—and should be paid their fair amount—for treating Huntsman employees and their families.  Aetna wants to pay the providers as little as possible.  The repricing companies have one job: to delay payment until the provider's biller relents and agrees to accept an amount well below the billed amount and well below what Aetna wrongfully obtained from the Plan.  If one repricing company is not making headway with a provider, then Aetna shifts the claim to another repricing company, and then another, and then another.  Aetna did not disclose to Huntsman that the repricing companies are subcontractors or that they are engaged in the claim adjudication and provider payment process.

78.     Aetna's use of repricing companies confirms its practice of taking more funds from the Plan than it paid to providers.  Aetna's agreements with the repricing companies require it to pay them a percentage of the amount they "save," *i.e.*, a bounty.  Aetna paid the repricing companies from the excess funds it wrongfully obtained from the Plan.  Aetna did not pay the

repricing companies their "bounty" from its monthly per-employee fee.  Rather, Aetna extracted the "fee" for the repricing companies from the amounts it obtained from Huntsman to pay provider medical claims.

79.    On information and belief, management and representatives of the repricing companies are aware that Aetna acted as the Plan's TPA.  Management and representatives of the repricing companies are aware that Aetna paid its "bounty" or "success fee" from an Aetna account or accounts containing funds from the Plan.  Management and representatives of the repricing companies are aware that Aetna obtained money from the Plan before it knew how much a provider will ultimately be paid.  Management and representatives of the repricing companies are aware that Aetna did not refund, credit, or offset to the Plan amounts that the repricing companies saved.

**D.    In Direct Violation of ERISA, Aetna Commingled Plan Funds with Its Own Funds**

80.    For many of these schemes to work, Aetna moved funds from the Plan's account into Aetna's own account containing Aetna's funds and the funds of other plans.  Because Aetna is an ERISA fiduciary, such commingling is not permitted.

81.    As a TPA and an ERISA fiduciary, Aetna was supposed to make payments from an account owned and controlled by the Plan.  Aetna was supposed to write checks from or make ACH transfers from the Plan's account to a doctor or hospital that cared for a beneficiary of the Plan.

82.    In practice, that did not happen.  Aetna obscured recipients of payments and payment amounts by directing the Plan to fund its account in certain bulk and undifferentiated amounts.  Aetna transferred funds from the Plan's account not to providers, but to an account or accounts owned and controlled by Aetna or one of its affiliates.  Aetna then made payments to providers from the Aetna account or accounts.  The Plan has no access to these accounts, so they

do not know—and have no way to determine—exactly how much the providers receive for specific claims and whether that matches the amounts the Plan transferred to Aetna for those specific claims.

**E.      Aetna Applied Less Rigorous Claims Adjudication Standards to Self-Funded Plan Claims Than It Applies When Adjudicating Claims for Its Own Fully Funded Plan**

83.     As an ERISA fiduciary, Aetna is required to treat claims submitted to the Plan like it treats claims submitted to its fully-insured plans.  As detailed above, Aetna did not do this.  Aetna applies rigorous standards for accepting, processing, and paying claims submitted to its fully-insured plans where Aetna is paying claims with its own money.  As a result of applying these rigorous standards, Aetna has a high rejection rate for claims submitted to its fully funded plans for payment.

84.     Aetna proudly declares in fraud resources available online that it takes a "zero-tolerance approach to fraud."  Aetna even has an entire section of its website dedicated to "Fraud and Abuse."  According to Aetna, estimated financial losses caused by insurance fraud "run in the tens of billions of dollars each year."  *Aetna Special Investigations Unit*, AETNA 1, 2, https://www.aetnafeds.com/pdf/FraudBrochure.pdf.

85.     Aetna claims to "lead the fight against fraud" through its "Special Investigations Unit," which is dedicated to "aggressively investigating all types of fraud using the latest detection, investigation and recovery techniques."  Aetna claims that "[w]hether taking on large health care management companies or individual providers, we work to protect you."  According to Aetna, its Special Investigations Unit "saves and recovers hundreds of millions of dollars related to fraud, waste, and abuse."  Aetna states that customers can "count on us to fight for you and everyone affected by fraud, day in, day out."  *Id.*

86.    Aetna asserts that "reliable fraud detection relies heavily on technology" and its Special Investigations Unit "goes a step beyond with dedicated IT staff and [its] own systems capability" in order to "gather a huge volume of claims data all in one spot." This way, Aetna claims, it can "use advanced software to comb through massive amounts of data" then "identify providers whose claims appear unusual or inconsistent with their peers.'" *Id.*

87.    Examples of "red flags" Aetna claims it investigates to catch provider fraud include: "unusual provider billing practices;" "billing patterns that are inconsistent with those of peers;" "discrepancies between billed services and patient records;" "unusually high volume or percentage of same services;" "pressure to pay claims quickly;" and "provider advertisements for 'free' services or other incentives." *Id.* at 3. As explained in detail above, those are the exact type of claims for which Aetna has approved payment from the Plan.

88.    But when Aetna is not responsible for paying claims with its own money, and instead pays claims with money from self-funded plans, like the Plan, Aetna applies far less rigorous standards for accepting, processing, and paying claims submitted for payment. On information and belief, as a result, the claim rejection rate for a self-funded plan generally, and the Plan specifically, is lower than the rate for Aetna's fully-insured plans.

89.    By prioritizing its own assets and resources to the detriment of the Plan, Aetna breached its fiduciary duty to the Plan.

90.    Moreover, as part of the Agreement, Aetna has committed to recover overpayments; to make recoveries for subrogation and coordination of benefits; and to police fraud, waste, and abuse for the benefit of the Plan. Aetna even has specific departments devoted to these activities.

91.     Aetna did not apply the above-described fraud prevention investigations, techniques, and technology to identify and prevent the payment of fraudulent or otherwise improper claims made to the Plan, or did not apply those fraud prevention investigations, techniques, and technology as stringently as they did with claims made to Aetna's own insurance plans.

92.     Aetna's failure to employ these fraud prevention investigations, techniques, and technology adequately, or do so as stringently as it does with claims made to its own insurance plans, violated its fiduciary duty to "process claims for Plan benefits incurred on or after the Effective Date using Aetna's normal claim determination, payment and audit procedures and applicable cost control standards . . . ."

**F.    Aetna Used Exclusion Lists as a Means to Limit the Scrutiny Applied to Huntsman's Claims**

93.     Aetna employs a tactic, strategy, or procedure that involves "exclusion lists."  To induce providers to join Aetna's network of providers and enter "in-network" agreements, and perhaps for other reasons, Aetna agrees to place providers on "exclusion lists."  A provider on this list benefits because being on this list commits Aetna to providing no scrutiny or limited scrutiny to the claims those providers submit for reimbursement.  Or, it commits Aetna to scrutinize and properly adjudicate only a small number or a small percentage of the claims the listed provider submit for adjudication.

94.     Discovery will show that Aetna used exclusion lists and consequently applied limited scrutiny to certain claims for which Huntsman ultimately paid.  Even the incomplete claims data shows that Aetna regularly processed claims from specific providers quickly, with no review, and with minimal revisions or adjustments, if any, to the amounts the provider billed.

95.     At no point did Aetna disclose the use of exclusion lists to Huntsman.  Nor did it disclose that claims for payment submitted to Aetna related to the care and treatment of Huntsman employees would not be reviewed or scrutinized.

## CLAIM ONE

### Breach of Fiduciary Duty under ERISA
### (29 U.S.C. §§ 1104(a) and 1109(a))

96.     Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

97.     Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1104(a), and 1109(a).  Plaintiffs have standing to bring this Claim under these provisions as ERISA fiduciaries.

98.     As the claims administrator to the Plan, Aetna is an ERISA fiduciary and thus owed/owes the Plan, Plan Participants, and Huntsman International LLC, a fiduciary duty to discharge its obligations to the Plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

99.     Aetna also owed/owes a separate and independent fiduciary duty to discharge its obligations in accordance with the terms of the Plan's documents.  *See* 29 U.S.C. § 1104(a)(1)(D).

100.    Aetna breached its fiduciary duties as set forth herein.

101.    Aetna further breached its fiduciary duties by approving claims for benefits that contained indicia of fraud without first determining (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by the Plan.

102.    Aetna further breached its fiduciary duty by not recovering from providers amounts paid pursuant to fraudulent or otherwise improper claims.

26

103.    Aetna's breach of its fiduciary duty resulted in improper payments of fraudulent or otherwise improper claims by Huntsman International LLC on behalf of the Plan.  These losses were ultimately suffered by Plaintiffs.

104.    Aetna has profited an undetermined amount due to the breach of its fiduciary duties.

105.    Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna's breach of its fiduciary duty; (ii) the recovery of any and all benefit or profits Aetna made as a result of its breach of its fiduciary duty; (iii) all such other equitable or remedial relief as may be appropriate; and (iv) the recovery of Plaintiffs' attorneys' fees and costs.

## CLAIM TWO

### Prohibited Transactions Under ERISA
### (29 U.S.C. §§ 1106(a)(1)(D) and 1109(a))

106.    Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

107.    Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1106(a)(1)(D), and 1109(a).  Plaintiffs have standing to bring this Claim under these provisions as ERISA fiduciaries.

108.    Aetna is an ERISA fiduciary.

109.    The health care providers and other parties to whom Aetna made payments pursuant to claims for health benefits that it approved are "parties in interest" under ERISA because they provided or purported to provide "services" to the Plan.

110.    By approving and paying fraudulent or otherwise improper or uncovered claims to such parties in interest, Aetna engaged in "prohibited transactions" by causing the Plan to engage in transactions that Aetna either knew or should have known constitute a direct or indirect transfer to or use by or for the benefit of a party in interest of assets of the Plan.

27

111.    Neither the Plan nor Huntsman International LLC received adequate consideration for the amounts that were paid for these prohibited transactions.

112.    In addition, Aetna retained for itself and transferred to itself monies from the Plan to which it had no lawful right.  Aetna further transferred some portion of the Plan's money, which was wrongfully retained or obtained, to its affiliates, to its subcontractors, and to other third parties as compensation for their participation in the scheme, pattern and practices employed by Aetna to obtain and retain monies from the Plan to which it had no lawful right.

113.    In addition, these wrongful acts breached Aetna's fiduciary duty.

114.    Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna having engaged in prohibited transactions; (ii) the recovery of any and all benefit or profits Aetna made as a result of having engaged in prohibited transactions; (iii) all such other equitable or remedial relief as may be appropriate; and (iv) the recovery of Plaintiffs' attorneys' fees and costs.

## CLAIM THREE

### Breach of Fiduciary Duty Under ERISA
### (29 U.S.C. §§ 1106(b)(1) and 1109(a))

115.    Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

116.    Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1106(b)(1), and 1109(a).  Plaintiffs have standing to bring this Claim under these provisions because they are ERISA fiduciaries.

117.    As claims administrator for the Plan, Aetna is a fiduciary under ERISA, and thus owed fiduciary duties to Huntsman.  ERISA forbids a fiduciary from engaging in self-dealing. *See* 29 U.S.C. § 1106(b)(1).

118.    Aetna controlled the adjudication, pricing, repricing, reprocessing, and payment of health care provider claims through an adjudication process.

119.    As a fiduciary, Aetna was required, among other things, to discharge its duties solely in the interest of the participants and beneficiaries of the Plan, to preserve the Plan's assets, and to disclose fully its actions and any compensation it was taking for its services.

120.    As set forth herein, Aetna breached its fiduciary duties by engaging in a variety of wrongful acts and practices.

121.    Additionally, Aetna made profits of an undetermined amount due to its breach of its duty of loyalty and care.

122.    Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna's breach of its fiduciary duty; (ii) the recovery of any and all profits or benefit that Aetna made as a result of its breach of its fiduciary duty; (iii) all such other equitable or remedial relief as may be appropriate; and (iv) the recovery of Plaintiffs' attorneys' fees and costs.

## CLAIM FOUR

### Prohibited Transactions Under ERISA
### (29 U.S.C. §§ 1106(b)(3) and 1109(a))

123.    Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

124.    Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3) and 1109(a). Plaintiffs have standing to bring this Claim under these provisions as ERISA fiduciaries.

125.    As claims administrator for the Plan with discretion over Plan administration and Plan assets, Aetna is a fiduciary under ERISA.  As a fiduciary, Aetna was prohibited from "receiving any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the plan."  *See* 29 U.S.C. § 1106(b)(3).

29

126. By retaining the difference between the negotiated price for medical services rendered and the monies withdrawn from the Plan, and collecting "savings" and "reprocessing" fees, Aetna received consideration from parties transacting with the Plan constituting "prohibited transactions." Among other things, Aetna used its control of the assets of the Plan, the negotiation of the price paid for medical services, and the engagement of "repricing" companies to improperly receive and retain monies from the Plan.

127. Aetna retained for itself and transferred to itself monies from the Plan to which it had no lawful right.

128. Neither the Plan nor Huntsman International LLC received adequate consideration for the amounts that were paid for these prohibited transactions.

129. Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna having engaged in prohibited transactions; (ii) the recovery of any and all profits that Aetna made as a result of having engaged in prohibited transactions; (iii) all such other equitable or remedial relief as the court may deem appropriate; and (iv) the recovery of Plaintiffs' attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court issue a final judgment:

a. ordering Defendant to reimburse Plaintiffs for any and all losses resulting from Defendant breaching its fiduciary duties and/or having engaged in prohibited transactions;

b. ordering Defendant to disgorge to Plaintiffs any and all profits that Defendant made as a result of its breaches of fiduciary duties and/or having engaged in prohibited transactions;

    c.      issuing a preliminary injunction compelling Defendant to provide all Plan claims data (subject to appropriate privacy protections);

    d.      granting all such other equitable or remedial relief as the Court may deem appropriate; and

    e.      ordering Defendant to pay Plaintiffs their attorneys' fees and costs.

Dated: June 3, 2024

*/s/ Jennifer Truelove*
Jennifer Truelove
Texas Bar No. 24012906
MCKOOL SMITH, P.C.
jtruelove@mckoolsmith.com
104 East Houston Street, Suite 300
Marshall, TX 75670
Telephone: 903-923-9000
Telecopier: 903-923-9099

Jon Corey
D.C. Bar No. 491311
jcorey@mckoolsmith.com
MCKOOL SMITH, PC
1999 K Street NW, Suite 600
Washington, DC 20006
Telephone: (202) 370-8300
Facsimile: (202) 370-8344

David I. Schiefelbein
New York State Bar No. 4767398
dschiefelbein@mckoolsmith.com
Emily B. Tate
New York State Bar No. 5769153
etate@mckoolsmith.com
MCKOOL SMITH, PC
1031 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

**Attorneys for Plaintiffs**
*Plaintiffs Huntsman International LLC and the Huntsman International LLC Employee Welfare*

31

*Benefits Plan*